We'll hear argument next in number 2009-1568 Intervet against Merial Limited. Elsevier? How do you pronounce your name? Elsevier. Elsevier. All right. May it please the court. Here, in view of the intrinsic evidence, there should be no doubt that the district court erred in construing the broad claim term Porcine Circovirus Type 2 to be limited to only the representative embodiments in the specification. You know, you could have saved everybody a lot of time if you had claimed a percent homology, right? And you didn't do that. Is there any reason you could tell me, like, why you didn't do that in the first instance? Your Honor, the term Porcine Circovirus Type 2 is sufficiently definite of the inventor's If what you're suggesting, I think, would be a claim that is different in claim scope. If you're claiming sequences that have a certain homology to Porcine Circovirus Type 2, then you're going to be going beyond naturally occurring viruses and getting into perhaps genetically engineered variants that are not naturally occurring. And you could potentially get into problems with the broader claim constructions in the Genentech, the Welcome case, where this court decided that claims that were broader than the naturally occurring viruses were not enabled. How could you patent a naturally occurring virus under FUNC? I'm having trouble with that. There's no discussion in the briefs about patentable subject matter, but Claim 32, at least, seems to implicate patentable subject matter, at least under your construction, because you're saying we can claim not only the isolates that we created, but anything that occurs in nature, naturally occurring, as you put it, that is similar to that. Well, first of all, as you correctly pointed out, Judge Dyke, Section 101 has not been raised in this case, so I don't think it's an issue for this court to decide here. But with respect to the particular claims at issue, we are not claiming the porcine circoviruses themselves. The claims are directed to isolated DNA molecules that have been placed into vectors for use in creating novel vaccines. But you're also claiming, as I understand your interpretation of these claims, that it would extend to isolates created by other people, not just the isolates that you created. I think I'm having trouble with the term created. What we are speaking about are naturally occurring viruses that are encompassed by the claim term porcine circovirus. But you created an isolate, right, as I understand it. You isolate a virus, but the claims are not directed simply to the virus. The issue is what is meant by the term solely to the virus. But claim 32 is directed to a naturally occurring molecule, isn't it? Claim 32 is directed to isolated DNA sequences that have been placed into a vector, and the particular sequences in claim 32... Well, 32 doesn't say being placed in a vector, does it? 9 refers to a vector, but 32 does not at least expressly refer to a vector. That is correct. Claim 32 does not expressly refer to a vector, but it does refer to the isolated DNA molecule that is comprising these nucleotide sequences that are encoding epitopes. So it does, your honor, it's not claiming the virus itself, it's claiming the isolated DNA molecules. But if somebody creates another isolate, what you're saying is that it's covered by your claims, that you're allowed to patent that even though it was naturally occurring in nature. I mean, it sounds like a problem. I think there's some confusion about creating an isolate. Maybe the confusion is, I mean, you refer to an isolated DNA molecule versus an isolate, and my understanding is that those mean two rather different things. So maybe to make sure we're all three, four of us on the same five, I guess, including counsel. You're correct, Judge. I think the question is, if somebody else isolates a DNA molecule from some completely different source, but that it satisfies the and not one, are they infringing? And the answer, your answer has to be yes. That's the plain terms, but how can, is that appropriate patentable subject matter, I think? Your distinction is correct. There is a difference between an isolated porcine circovirus and an isolated DNA molecule. And I do agree with the proposition that you put forth, is what we are saying is that if an accused product is an isolated DNA molecule that meets the elements of the claims, then it doesn't matter what the source of that isolated DNA molecule is for purposes of infringement. So why isn't there a patentable subject matter issue? I mean, you know, you may say, well, you can't take into account patentable subject matter and construe the claims. That's the question. The question is what Phillips, what the limits of Phillips are. But isn't it correct that there is a patentable subject matter problem under your claim construction? With all due respect, Your Honor, I don't believe there is a patentable subject matter with respect to these claims that are directed to isolated DNA molecules. And I would with regard to the entire United States biotechnology industry, which is based on claims to isolated DNA molecules. And again, I, this. Because this problem would exist regardless of the scope, regardless of the scope of the claim construction, right? Because even if the claim is limited to the five specific isolates, then it still would have the same subject matter problem, I suppose. That's correct, Judge Bison. All right. I would now like to suggest that getting back to the issue of the accused isolate in this case, that either InterVet's porcine. I'm not sure that it isn't a different problem with respect to the isolates, the five isolates, in carrying it beyond those to other isolates that are created by other people. No? I'm not sure whether the, and again, I'm troubled by the word created, because what we're talking about here are what is in the scope of the term porcine circovirus type 2. And the question is whether or not that term is properly limited to the representative embodiments in the specification, or whether that term, in light of the intrinsic evidence, covers all naturally occurring porcine circovirus isolates that are of the same type as these representative embodiments. Here, the particular InterVet sequence at issue, which is literally sandwiched between the representative embodiments in the specification, must be of the same type of those representative embodiments. If it's not literally of the same type as those representative embodiments, then this is clearly the type of case for which the doctrine of equivalence was created. Doctrine of equivalence presents a host of questions on its own with respect to prosecution history. But let me, I know your position here, the other side will point out, has been evolving, and I don't want to discuss the waiver part of it. But it seems like at least, what are you posing to us now as the court construction? I understand it includes the 76%, am I right? That's correct. I'm just wondering, looking at the relevant paragraph in column one that we've all been looking at, what is the justification for using the 76% disclosed there, but not also the 96%? The issue in this case is whether or not the accused InterVet isolate is a porcine circovirus isolate of type one or a porcine circovirus isolate of type two. There are only two types. Well, so far, only two have been discovered. There are only two types that are disclosed in the patent, and in the dozen or so years since the patent, there have only been two types ever. So that must be that no one will ever discover another one. That's correct. I wouldn't count on it. There was a time at the end of the 19th century when the physicists thought that all physics had been basically worked out. It was just a matter of fine-tuning Newton's law. It was before quantum mechanics. The difference is that the distinction between the two types is the previous type of porcine circovirus, as the patent makes clear, is non-pathogenic. The type that is claimed by the inventors here is the pathogenic type of porcine circovirus. So we're really dealing with two types, non-pathogenic and pathogenic porcine circoviruses. In answer to your question, Judge Prost, when we're distinguishing between the two types, the degree of similarity among the representative embodiments is not necessary to distinguish between the two types. The 76% limitation provides sufficient definitiveness for a person of skill in the art to understand whether a particular porcine circovirus isolate is a porcine. The 96% question may become relevant with regard to written description, but that's not at issue in this case here, and whether or not the embodiments in the specification provide a sufficient disclosure of the breadth of all isolates of porcine circovirus type 2. But here, for purposes of this case, the 96% is also not relevant because the accused isolate, which is 99.7% identical to one of the representative embodiments, is clearly within the scope of that 96% limitation. So if this court were inclined, for purposes of this case, to believe that the 96% limitation needed to be included as part of the claim construction, it wouldn't have any bearing on the particular infringement issues in this case. And pursuant to the Pickles opinion that we cite in our brief, it's not necessary for this court to construe the outer limits of a claim that are not at issue for resolving the specific issues in this case. Well, except that, I don't know, is there a counterclaim on validity hidden behind the curtain here? I mean, it might well, the claim construction might well impact validity challenge. There's not such an issue that I'm aware of in this case, Your Honor. There's not? I thought they raised invalidity in the answer. Invalidity is raised, but the issue of whether or not there is a, for example, an isolate that is only 94% homologous to the representative embodiments, whether or not that would constitute prior art or not, an issue such as that is not raised in this case. With respect to these particular porcine circoviruses, they're very tightly knit groups, as we discuss in our brief. You have porcine circoviruses of type 1 over here, and the homology among PCV1 isolates is very narrowly defined, similar to the 97, 96% range. And then, you know, the PCV1 and PCV2 isolates are only 76% homologous. Let me add, excuse me, in the red brief, when they're discussing the 24%, they say as a matter of simple mathematics, the grouping of PCV2 viruses could include viruses that have as little as 52% homology with each other. Do you agree with that statement? I don't agree with that statement, Your Honor. As a matter of biology, I think it would be impossible for you to have a naturally occurring porcine circovirus that is only 70, the two naturally occurring porcine circoviruses, both of which are only 76% homologous to the PCV1 isolate, and to not be substantially similar to one another if they are to have the same porcine circovirus properties and be pathogenic and come from PMWS pigs, which are the other limitations that we propose. What is, just to make sure I understand your definition of PCV2? You touched on it here, but I want to make sure I understand the exact definition for us to adopt. The phrasing that we present on appeal is it encompasses the of any naturally occurring porcine circovirus strain that's isolated from pigs with PMWS that is not the previously known non-pathogenic type of porcine circovirus strain. And that's similar to the phrasing that we propose to the district court below. The additional limitation that the DNA sequence of its genome is only about 76% homologous to the DNA sequence of the genome of the previously known PK15 PCV1 strain was added. It was a limitation that we discussed in our original briefing as being a characteristic of the new type, but it was specifically added to try and address what the district court believed were indefiniteness concerns. PCV2, if I can boil down what you said, it sounds like you're saying PCV2 is anything obtained from a sick pig that's a circovirus that isn't PCV1. So if I come up with PCV, a quite different PCV, a circovirus, I know you say, well, I would have by now because the science has moved on and nobody's found it, but let's assume for the purpose of argument that I come up with another circovirus that isn't PCV1, it is PCV2 by definition, that's your claim? Our contention is we distinguish between the non-pathogenic and pathogenic. So our contention is if it comes from a PCV, from a PMWS pig and it's pathogenic and it's not the previously known non-pathogenic type, that it would be encompassed by the definition of non-pathogenic. That construction is indefinite and we believe that by providing the representative embodiments in the specification that we have satisfied the written description requirements by providing sufficient representative examples of the scope of the claims. And you'd say that would be true if my PCV3, let's call it, which I name it, you would say that is now covered by the PCV2 claim as long as it causes some, it has some pathogenic quality. Regardless of what the genetic structure looks like. Well, again, our viewpoint is that the genetic structure would necessarily be similar to the representative. I know you want that to be the case, but I'm positing for you to try to test the limits of your definition, a genetic structure that is substantially different from both PCV1 and what you now are looking at as your five sequence strains or four sequence strains, what you're calling PCV2. Well, I think as guidance, there's two recent cases from this court that were issued after the briefing in this case, and that's the in the hearing components be sure case that was decided April 1st. And those cases stand for the proposition that a claim term is not necessarily indefinite merely because it doesn't define the scope of the claim with mathematical precision. If there are representative embodiments or examples in the specification that provide sufficient guidance to a person of skill in the art such that they could determine the scope of the claim terms, then the claim term is not indefinite. Here, we provided several representative embodiments in the specification that give a person of skill in the art guidance as to the proper scope of the claims. As we, you know, point out, and we've always claimed included within the scope of our claims would be highly homologous naturally occurring variants of the same virus type. The representative embodiments in the specification, as Judge Prost points out, have a homology of 96%. And so certainly, naturally occurring porcine circoviruses that are isolated from PMWS pigs that have a degree of homology that is within the range cited in the specification, and it's shared by the representative examples, would a person of skill in the art would understand those to be within this, at least those to be within the scope of the claims at issue here in this case. Let me ask you why we're dealing here with claims 9 and 32 and why, for example, claim 25 hasn't been asserted. The claims at issue there, and, you know, this is a dependent claim referring to several independent claims, but, for example, referring back to claim 1, claim 1 would not be at issue in this case because- No, no, no. But 25 is, as I understand, is a vaccine comprising a vector of 9. So why is it that we're dealing with 9 instead of 25? I apologize, Your Honor. At this point, I couldn't tell you without going back to wondering whether there's something missing that would make it a problem to assert claim 25. I don't believe so, Your Honor, but I can't recall at this point why that particular claim was not asserted. I believe my time may have expired, so- Yes, but we've been pestering you with questions, so we'll give you a little bit of time. Thank you, Your Honor. Good morning. May it please the Court. As we just saw from Marial's counsel, the construction of PCV2 that they are offering in this case is a constantly moving target. They have been unable to articulate any construction of PCV2 beyond the five strains that is supported by the patent specification. Well, if they went beyond the five strains, would there be a patentable subject matter problem? Your Honor, I believe there would be. If they went beyond the five strains, I think that there is a 112 problem, so I think that there is an invalidity problem. With respect to whether there's a patentable subject matter problem, these are naturally occurring viruses. That's all they did was isolate naturally occurring viruses, so I think there may be an issue with respect to patentability of the subject matter. Has that been raised? I'm sorry? Has that been raised? There are no counterclaims in this case? There are invalidity claims in this case, but not under 101. Not at 101. Not in fact there is a 101. 101 is in the count. Okay, I'll take that. I'll take your word for that. I don't recall, Your Honor. In any event, I think until, to be fair, I think until recently people believed that these types of claims to isolated DNA molecules were patentable subject matter under United States patent law, and that therefore there wasn't a serious argument made that these weren't patentable because they were simply isolated products of nature. But assuming that the law changes, then there may in fact be- Well, the question is whether they can go beyond the five strains. It may well be that everybody would accept that the five strains are patentable. The question is whether other strains, which they want to include in their claim scope, are patentable subject. We would say that first of all, there are no other representative embodiments. Counsel kept calling these the representative embodiments of PCV2. There are no other representative embodiments in the 601 patent. The full extent of PCV2 in the 601 patent are these five isolated viruses. But that's what they're saying, are the representatives. It's true that there are not any others other than the ones that they've pointed out, but they've pointed out five. They've pointed out five, but there is no direction in the patent that would allow you to interpret the term PCV2 more broadly than those five strains. In other words- How about a strain that's halfway between one of the isolates and another isolate? It has very high homology with both and appears to have basically just a mutation of one of them. These are viruses, my understanding is, are very sloppy copiers, so it's not going to take long before you're So why wouldn't that be a perfectly good example of something that falls within the class of which these five are representative? The reason is that that definition of PCV2, of PCV2 embracing, let's say, natural variants, is not set forth in the patent specification. And a claim to these PCV2 viruses and natural variants was never presented to the patent office. Well, natural or artificial variants. I mean, you could engineer a few changes pretty easily, I suppose, and if we limited the patentees to these five strains, presumably just about anything you engineered by way of a deviation, a very small deviation from one of these strains, would still have the same pathogenic quality and therefore the same quality for creating an antigen. I actually think that the supposition there that you would presume that a virus that's within 96% homology of any of these viruses, that it would have the same properties, is unproven. No, it's unproven, but it's a pretty good shot. And that if you change two nucleotides, it probably isn't going to be a vast change in the properties. It might, but... I think in biotechnology, it very well might. And we know that in biotechnology that minor changes in nucleotide sequence can lead to major changes in amino acid sequence. And because they didn't identify the active portion of these viruses, we have no idea which portions of the virus you can change. Okay, but yours works. I mean, it might be the case that in some hypothetical instance, it would lose its pathogenic quality. But of course, the reason that yours works is because it didn't lose its pathogenic quality. Well, I think that there's an open question as to whether our virus is pathogenic. Our virus... Well, it creates an antigen to which the immune system of the pig responds in a way that gives the pig immunity, so it has at least that quality. That is correct. Where did your strain come from? From a farm in Nebraska. And I thought there was some suggestion that this had been identified in prior art, no? No. The virus that InterVet uses to make its product was not identified in the prior art. What was in the prior art was an identification that this disease PMWS was likely caused or associated with new variants, new genetic variants of porcine circle virus. So a claim to porcine circle viruses that are genetically distinct from the prior art PCV1 that are associated with PMWS, that was already in the prior art. And I'd like to talk, if we could, just for a moment about the issue of waiver. Well, before you get to that, I guess I'm struggling a little, so maybe I just want to be sure you have nothing to add. I mean, the language we've been looking at with the 96% says these five are exhibit... The strains exhibit a very strong homology with each other at the nucleotide level, exceeding 96%, blah, blah, blah, and they should be considered as representative. I'm not sure I understand why that translates into only these five strains as opposed to these five strains and anything that meets this limitation of 96% with each other as well. Right. I understand your issue. In the patent, in column one, where you were just reading from, it says at line 63, the subject of the present invention is therefore the group two porcine circle virus as defined above. And then above that at line 48, it says the applicant has succeeded in isolating five new PCV strains. It tells you where they isolated them from. And then there's a definitional statement here and after called circle viruses according to the invention. And then in the paragraph you're looking at, they give you homology observations with respect to four of those viruses. They're not even characterizing all five of the viruses that they isolated. They provide you with these two raw homology observations, 96% among the group, 76% with PCV1. And there are good scientific reasons why no person of skill in the art would read that as a definition of PCV2. First of all, the raw homology of 96% homology to one of those tells you nothing about the function of the virus, whether it will actually be pathogenic, whether it will be a causative agent of PMWS. And then with respect to 76%, just to say, to define a virus by its similarity to the prior art virus, tells you nothing again about the 24% that presumably makes it unique, that makes it special, that makes it work, that makes it pathogenic. And so as we set forth in our brief, it leads to absurd results. If you just define it by 76%, where you could have two viruses that are as different as they are alike, both being determined to be PCV2. And also you could take the PCV1 DNA sequence, change 24% of the nucleotides in that sequence and have exactly the same virus, PCV1, same amino acid sequence, and still fall within the definition of PCV2. So these two homology limitations make no sense in defining PCV2. And before the district court, in the Markman context, Marial's expert said that neither one of these homology limitations define PCV2. He refused to say that either one of these would be found to be a definition of PCV2. And although today council suggested that it would be okay if you crafted a construction that included 96%, at the Markman hearing, council for Marial said, point blank, that 96% does not question. The fact that they want more doesn't mean that they're not entitled to some subset of everything that they want. I mean, I don't know that the fact that they said that doesn't define PCV2 doesn't mean anything more than that it doesn't define all of the set of PCV2. I certainly think everything with 96 up and having all the other qualities that they put into their definitional section, they would say assertively and emphatically, is PCV2. Yes. So why not? But I'm sorry, I don't know. Why is that not the case? Well, you were, you were. I think, I think what I was trying, the point I was trying to make was that that they've already said, Marial has said, this portion of the specification that Judge Prost was pointing me to does not define PCV2. Those homology limitations do not define PCV2. That's what they told the district court. That's what their expert said. And so then the question is, I think is being raised by Judge Bryson is, okay, well, if they don't get that, then is there something broader than the five strains that they're entitled to? Right. That's. And the patent specification provides no direction as to where you go once you get beyond the five strains. There are lots of statements in the patent about, you know, we, we anticipate there will be additional homologies and hybridization characteristics and serologic similarity. None of that defines PCV2 as determined by the district court. And none of that was offered in, in a patent claim to the patent office. It's simply not there. If I, I'd like to address the waiver issue just briefly. And counsel said that their, their latest claim construction is essentially the same as their first two claim constructions, and that's simply not accurate. In, in their latest claim construction, they say that it, the virus needs to be isolated from a pig with PMWS. But the term isolated in another context in this case has been asserted by their expert to have a very narrow meaning. And Intervet disagrees with that meaning. And so the, if you import the idea of isolation into this tech, into this definition of PCV2, it'll have ramifications in the invalidity portion of this case. It is a significant claim, difference in the claim scope. You're saying that isolated in this context means something very different from derived. It does. Yes. It, it could mean lots of different things. It could mean derived by a specific technique. That's what their expert said it meant. It could be isolated in the sense that it's been removed from its natural environment. And there's, there's going to be a dispute about what the term isolated means. And the point is, is that that is a significant claim, change in claim scope. It's not like the Harris case, where there was an infinitesimal tweak in the, in the claim scope that was affected just simply by changing arguments. These are not new arguments in support of an old claim construction. This is a totally new claim construction with a totally different scope and they've waived it. And we think that the issue, that issue has not been preserved for appeal. If I, I could just briefly touch on claim 32. Claim 32 is directed to a nucleotide sequence that encodes an epitope that is specific to PCV2 and not specific to PCV1. And what this claim is directed, is claiming is a DNA sequence that will allow you to make a diagnosis. The term specific is used in the claim and the only use of the term specific in the patent specification is in the context of diagnosis. And so what this claim is really directed to are DNA sequences that allow you to detect PCV2 and not PCV1 and not get a false positive. So that if you have a sample and you want to know if it has PCV2 or PCV1 in it and you put the DNA in it or you, whatever you've generated from the DNA into it, you can tell which one you have. If you get a positive reaction, you know it's PCV2 and not PCV1. Muriel's construction allows the scope of claim 32 to embrace mostly PCV1 and only a little PCV2. And it's crystal clear that that type of DNA would, would not allow for a specific diagnosis. It would allow for a false positive. If you were to use that kind of DNA, you wouldn't get a specific diagnosis. And therefore we think that the claim construction we proposed is the correct claim construction. Flows from the prosecution history. It flows from the language of claim 32 and it should be adopted if the court is going to entertain a new claim construction on claim 32. Your construction has to be derived from one of the five strains? Our construction, well what, what the derived from issue arises from the district court's use of the word from. No, but is that your construction? I mean the district court seemed to have said it had to be derived from one of the five strains, right? The district court said it had to be found only on or unique to one of the five strains. And we believe that that is the correct interpretation of the district court's claim construction. That wasn't the claim construction we proposed. That was the claim construction that Muriel proposed that the district court adopted verbatim and now wishes to change because of the change in the scope of PCV2. And we think that they should not be allowed to change that, that claim construction based on principles of judicial estoppel. I have a factual question which you can help me with. We've been talking about the five strains. Now if I, correct me if this is wrong, but I understood that four of the five strains, the five strains were all identified as we, strains again we get into problems with the use of that term, but I think we can all agree that if I say isolate we know what we're talking about, right? Yes. As opposed to set aside, okay, strike strains. Five isolates. Now four of them were sequenced, right? Yes. The fifth was not sequenced. Correct. All right, now how do we know given your construction of the claims whether something falls within the scope of the claims based on the fifth of those isolates? I think that in order to determine whether you had in fact that fifth isolate, to determine with certainty you would have to get it from the decide whether you, so as far as the patent goes right now, you would say it's indeterminate as to whether something until and unless you sequence the deposit. I would say that based on what is in the patent specification, you can determine whether you have any of those four strains that were sequenced. Sure, but I'm talking about the fifth. Yeah. I mean, we'll go ahead. No, I was going to say Marial has never alleged that InterVet has fifth strain, which I presumably would have done if InterVet... You know, it just seems a little odd to say, well, we have a definition which ought to be limited to these specific isolates, and we've sequenced some of them. That's how we're going to tell if your form of PCV2 is within our definition, but we haven't sequenced the other one, but we nonetheless have to do that in order to make an infringement determination. It strikes me as a bit odd. I think that it points out the inadequacy of the patent specification in defining a broader genus as required under Eli Lilly in order to define a genus that a person of skill in the art could recognize as a genus. You have to identify some common structural feature of the members of the genus and then use that to define the genus. Here, there's none of that, and I don't think that the fact that one of the viruses wasn't sequenced saves the... But if their claim construction were adopted, it went beyond the five isolates. In order to determine infringement, you'd have to sequence the other isolate anyway, wouldn't you? I think that if their claim... I don't know which claim construction they're talking about, but if we just confine ourselves to PCV2 means anything that's not PCV1, I don't know that you need to do much sequencing in order to determine infringement of that claim construction. Why is that? Because it's incredibly broad, because it means that if your virus is anything but... If it's a circovirus, and now they say it's isolated from a sick pig, whatever that means, then if it's greater than 76% homologous to PCV1... I'm sorry, less than 76% homologous to PCV1, then it's theirs. But if we come up with a construction that includes the representative strains, the five strains, plus the 96% to each other, then you'd have to sequence the fifth, right? You would have to sequence the fifth, yes. Okay, we'll hear a lot of argument now from Mr. Savier. Thank you, Your Honor. First, with respect to this waiver issue of a distinction between isolated and defined, this is an issue that I'm not familiar with, because I don't believe it was identified in the briefing that InterVet believed that there was a difference between those two terms or explained why it presented any issues in this case. Obviously, the patent specification speaks in terms of the five representative strains being isolated from PMWS pigs, and then in column 2 at lines 20 says the invention aims to consider the porcine circovirus isolated from a disease pig. So that's the context in which we're using the term isolated. I mean, we're not intending to impart any particular meaning beyond that. With respect to the counsel's assertion that in order to claim a genus of biological species that you have to somehow define the structure associated with a particular function in order to claim that genus, that is in conflict with this court's recent decision in Ariad in which the court said that there are two ways in which you can claim a genus, one being the one that counsel was referring to, and the other was to provide a sufficient number of representative examples of the genus. And that is what was done here in this case. Well, but there's a question as to what that means to supply a sufficient number of representative examples, and why are the five examples here sufficiently representative? The evidence in this case, which we cite in our brief, is that when you're dealing with viruses, a single prototypical virus is sufficient guidance to a person of skill in the art to understand the scope of that particular virus type. And here the inventors provided several representative examples of their newly discovered virus type. So if we're talking about a written description issue here, which is the direction I think counsel is going but is really not an issue before this court, I think the evidence is clear that there is a sufficient written description. There's certainly not clear and convincing evidence that there is not a sufficient written description in this case. Do you mean, I want to make sure I understand the point you just made about representative of a genus. Do you mean to say that a single species would be enough to establish the bounds of the genus, even if you didn't add to the single species qualities such as the properties, structure, and so forth? Are you saying that you give an expert a sequence of a virus and that expert knows what the bounds of the genus are? The evidence in this case is that when you're dealing with viruses, that persons of skill in their viruses are of the same type of that virus based on a single representative prototype virus. Without knowing anything about their properties, just looking at the comparative sequences of the two viruses. Well, obviously with knowing the properties of that particular isolate, but that provides sufficient guidance. I mean here in this case. Knowing the properties of the other virus types that are known. With reference to the counsel's assertion that we did not represent to the district court that the 76% homology limitation was important. I think if you'll look at the record from the Markman hearing, that in fact we said the same thing to the district court that we're saying today. That it is the 76% distinction that's important that gulf between PCV1 and PCV2 that provides guidance to a person of skill in the art as to whether or not a porcine circovirus is properly classified as PCV1 and PCV2. As I understand it, maybe I'm mistaken about this, but as I understand what they're saying is that that 76% homology doesn't tell you that something that satisfies that has pathogenic qualities to it, right? That is correct, but the 76% doesn't definitively tell you if a virus is pathogenic or not. Here, the other elements of our claim construction require, however, that the virus be pathogenic in order to fall within the scope of PCV2. So that's another element of in order for it to be consistent with the area decision, it's not necessary to identify structure associated with a particular function if you provide sufficient representative examples of the scope of your claims. And here, we provided several representative examples that provide guidance to a person of skill in the art of the scope of the claims. And again, Yeah, but I suppose what Ariad meant by that is that in this context, those examples would allow you to determine which ones are pathogenic and which ones aren't. No? I think a person of skill in the art would understand based on the disclosure in the specification and those representative examples that they would be able to recognize that if you isolated a porcine circovirus from a PMWS pig, and it was not the previously known non-pathogenic porcine circovirus, and that distinction would be based on the homology, that the person of skill in the art would understand that that virus is likely to be a pathogenic porcine circovirus. Here in this case, there's no dispute that the particular isolate that's an issue from InterVet is indeed pathogenic. But if it turned out not to be pathogenic, would it be within the scope of your definition of PCV2? Under our view of the scope of PCV2, a non-pathogenic porcine circovirus would not fall within the scope of what is PCV2. Even though it was not, and decidedly not, PCV1? That would be true. I don't think that, again, that such a virus exists. You don't believe such a virus exists or ever will be found. But assuming with me that somebody right now in a lab has found PCV3, you're not contending that a non-pathogenic virus isolate, circovirus isolate from a sick pig would be PCV2? That is correct, Your Honor. But your problem then is that the homology doesn't define what's pathogenic, and that Ariadne says that the representative sample, you can't import a function limitation in here. You have to, from the representative examples, be able to determine the scope of the genus. And what I understand you to be saying is that you're imposing an additional function limitation, which says they're pathogenic, and that you don't draw that from the homology, right? Well, pathogenicity is a separate characteristic. But that's the problem. Well, I don't believe it is a problem because a person of skill in the art can determine whether a particular virus is pathogenic by virtue of whether it's enabled to infect a pig. And in this case, there's no dispute that the particular porcine circovirus is, in fact, pathogenic. Well, but PCV1 is found in pigs, and it's non-pathogenic. It was isolated from the lesion of a sick pig. Porcine circovirus type 1, the evidence shows, is not associated with the lesion of a sick pig. The examples in the specification teach isolating from the lesions of PMWS pigs to determine pathogenicity. And in fact, the definition, that's why it's important that the definition that we propose distinguishes from PCV1. Thank you. Thank you. The case is submitted.